### In re UNION LEAGUE CLUB OF CHICAGO.

### O'MALLEY et al. v. UNION LEAGUE CLUB OF CHICAGO.

#### No. 10712.

United States Court of Appeals
Seventh Circuit.

April 16, 1953.

382

Arnold I. Shure, Chicago, Ill., Paul N. Dale and Brimson Grow, Chicago, Ill., for appellants.

Roscoe C. Nash, Charles A. Thomas, Chapman & Cutler, Chicago, Ill., of counsel, for appellee.

Before DUFFY, FINNEGAN and LINDLEY, Circuit Judges.

LINDLEY, Circuit Judge.

In the course of the proceedings incident to the reorganization of the debtor, the Union League Club of Chicago, under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., an issue arose as to whether the debtor is liable for interest upon bonds secured by a second mortgage upon its real property, for the period from August 1, 1932 to July 16, 1935. The District Court having decided, in its decree of July 10, 1952, that no such liability exists, the bondholders' committee perfected this appeal. While the ultimate question of whether the court erred in this respect would seem to be a narrow one, its solution involves a somewhat careful examination of the record of an earlier reorganization of the same debtor under former Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

The first proceeding had its inception in a voluntary petition filed June 14, 1935, accompanied by a proposed plan of reorganization, which, on June 15, the court approved. At the same time it approved also a form of transmittal letter and one of acceptance to be sent to the bondholders, fixed a date for a hearing as to confirmation of the plan and directed that notice be given to all parties in interest. Later, on July 8, the court approved the notices, granted the debtor leave to propose its plan, allowed and classified certain claims and determined that the only creditors who would be affected by the plan were the first and second mortgagees.

At the hearing on July 16, 1935, the court entered an order confirming the plan. After reciting that all parties in interest had been heard or had had opportunity to be heard, the court found that the Northwestern Mutual Life Insurance Company held a third class claim under a first mortgage securing a note for $2,350,000 with interest at 5½% per annum and the bondholders a fourth class claim consisting of bonds aggregating originally $1,457,500 secured by a second mortgage, together with interest due upon coupons maturing between August 1, 1932 and July 16, 1935 aggregating $218,625. It is this interest which the District Court in the present case found

had been cancelled as a result of the earlier reorganization and with which we are here concerned.

The plan, thus confirmed and expressly made a part of the decree of confirmation, recited that the first mortgagee had agreed to waive all interest in default, amounting to $269,165, and certain additional interest accruing in the future in the sum of $176,250, provided the bondholders joined in the plan; that the debtor would pay no interest on or principal of any of the second mortgage bonds, until the principal of the first mortgage debt had been reduced to $1,000,000; that, after such reduction, it would apply one-half of its net earnings to payment of interest upon the second mortgage bonds to the extent and in the manner provided in the plan; that the debtor's obligation to pay interest on the bonds would be so modified that it would "be under no obligation to pay any interest whatsoever, *whether heretofore accrued or otherwise*" (all emphasis supplied) except as provided in the plan; that until the first mortgage debt "shall be reduced to $1,000,000 or less, or until Nov. 7, 1944, whichever date shall be earlier, the club shall be under no obligation to pay interest on said" bonds "at any time, *nor shall any interest accrue thereon*"; that upon the happening of whichever should be the earlier of the said events, "interest * * * shall *commence to accrue* upon said bonds"; that if the date when said reduction in the first mortgage debt occurs should be earlier than November 7, 1944, the Club would apply one-half of its net earnings for each six months accounting period after the date of reduction to the payment of interest for such accounting period. In case the indebtedness due the first mortgagee had not been reduced to $1,000,000 on or before November 7, 1944, then, commencing on the latter date, interest upon the bonds "shall accrue" but that no "such interest shall be paid" until the first mortgage indebtedness has been reduced to $1,000,000 or less, when, under the terms of the plan, the Club would become obligated to apply one-half of its net earnings to the payment of interest on the bonds as aforesaid. If, after such events, the amount of earnings for any

six months accounting period should exceed the interest requirements under the plan for such accounting period the Club was to apply such excess to the payment of "accrued interest" upon the bonds if there should be at that time any such "accrued and unpaid" interest.

The court approved also the comments on the plan submitted to the creditors, wherein it was said that, although the "bondholders waive interest for a substantial period of time," such waiver merely "recognizes" existing conditions. The Extension Agreement, also a part of the plan, called for delivery of the bonds to the First National Bank of Chicago as Depositary and provided that the interest coupons attached thereto, for the period in controversy, should be detached, cancelled and cremated and the bonds registered and redelivered to the bondholders endorsed in accord with a legend included in the plan.

The court, in its decree confirming the plan, directed the Depositary to detach, cancel and cremate the coupons and enjoined any and all bondholders, whether they had deposited their interest coupons or not, "from suing on, collecting or taking any action with respect to the interest coupons appertaining to said bonds". The Extension Agreement executed by the bondholders contained a clause to the effect that the plan contemplated "the elimination of interest payments thereon until the time specified in the plan and limits the extent to which interest is payable after that time". The notice approved by the court and sent to the creditors likewise recited that the plan would eliminate all interest payments until the first mortgage indebtedness had been reduced to $1,000,000, that it would limit the extent to which interest should be payable after that time and that all interest coupons would be detached and cremated and the bonds endorsed with a legend evidencing the extension of their maturity, "the elimination of interest payments" and other modifications of the indenture proposed in the plan. In the final decree the court declared that all interest coupons "shall from the date of the said order be null and void" and that from and after that date payment of interest should be

governed by the plan of reorganization, the Extension Agreement and the order of the court.

It is the position of the bondholders that, despite the quoted provisions of the plan, the Extension Agreement and other documents, all approved by the court, and despite the provisions of the decree itself, they are entitled to recover the interest represented by the cancelled coupons maturing between August 1, 1932 and July 16, 1935. The trial court in this cause held to the contrary that the interest had been waived, cancelled and eliminated by the plan of reorganization and the decree of July 16, 1935 confirming it; that under the terms and provisions of the earlier confirmed plan of reorganization, the debtor's obligation to pay interest on its General Mortgage Six Per Cent Twenty-Year Sinking Fund Gold Bonds had been modified so that: "(a) the Debtor is under no obligation to pay any interest whatsoever on said bonds (including the interest which accrued thereon during the period from August 1, 1932 to July 16, 1935) as originally provided in and by said bonds, the interest coupons appertaining thereto and the Trust Indenture securing the same, the obligation to pay such interest being fully discharged and satisfied by the provisions of said plan and by the destruction and cancellation of said interest coupons pursuant to said plan and the consent and authorization of the holders of said bonds who accepted said plan, and (b) interest commences to accrue on said bonds at the rate of 6% per annum from the date on which the first mortgage indebtedness of the Debtor is reduced to $1,000,000 or less, or from November 7, 1944, whichever date is earlier, and is payable by the Debtor only in the manner and at the times provided in said plan."

■ We think that the District Court correctly ruled that the clear intent of the various clauses and provisions we have mentioned and others similar thereto contained in the final decree of July 16, 1935 was that the interest represented by coupons maturing before July 16, 1935 was, as a part of the plan, forever cancelled; that in pursuance thereof, the coupons which constituted the evidence of the interest due

were, by order of court, detached and cremated and the obligation of the debtor to pay them terminated We find nothing in the court orders approving the plan or confirming it, indicating in the slightest degree an intent that the reorganization contemplated rejuvenation, rebirth or renaissance of the debt represented by the cremated coupons. There is not the slightest ambiguity in the words used, for the plan expressly provided that until the first mortgage debt should be reduced to $1,000,000 and until the earnings should justify the payment, interest should not even *accrue* and, therefore could not become due and payable, until after these events had occurred, *i. e.*, the mortgage debt had been reduced to $1,000,000 and the earnings of the company justified payment. Only after those factual situations came into existence was any interest to accrue to any of the bondholders and then only in the amounts accruing thereafter in accord with the plan. After the reorganization the bondholders were entitled to recover interest only when the contingencies provided by the plan and decree had occurred. Such interest as did so accrue under the plan is provided for in the present proceedings and is not in controversy here. We conclude that the bondholders are without the slightest color of right to insist now that their debt represented by their interest coupons, cancelled and cremated, should have a rebirth and be brought to life again.

█ Where a party voluntarily assents to the destruction of an instrument, his act can mean only that the parties have cancelled the obligation represented thereby. Thus, in Larkin v. Hardenbrook, 90 N.Y. 333–334, the court said: "There certainly could not be higher evidence of an intention to discharge and cancel a debt than by a destruction and surrender of the instrument which created it, to a party who is liable by virtue of the same." This is in accord with the Restatement of the Law of Contracts, Sec. 432, where the principles are epitomized as follows: "A contractual duty that arises under a formal unilateral contract is discharged, (a) by the destruction or cancellation of the document em-

bodying the contract, or (b) by its surrender to the party subject to the duty or to some one on his behalf, by the party having the right, with the intent to discharge the duty; * * *" See also Section 122 of the Uniform Negotiable Instruments Act, Sec. 144, Ch. 98, Ill.Rev.Stat. Had the coupons remained in existence and been stamped with the same legend as the bonds and the plan had so provided, there would be no question of course but that there was an intention to keep in force the obligation to pay them. But such is not our case and the difference in the treatment of the coupons and that of the bonds speaks with force,—one was destroyed and the other kept alive, with interest upon the same to begin to accrue again only when the first mortgage indebtedness had been reduced to $1,000,000 or November 7, 1944. This, we think, is the plain intent.

█ It is argued by the bondholders that paragraph C2(e) of the plan of 1935 requires the debtor to pay interest which had matured prior to July 16, 1935. Under that paragraph, when, under the terms of the plan the Club is obligated to apply one-half its net earnings to the payment of interest, the Club is obligated to apply any excess of the earnings to the payment of accrued and unpaid interest "if any such interest shall at the time be accrued and unpaid for prior periods". It is perfectly clear, however, that the accrued and unpaid interest mentioned in this quoted provision must be construed in conjunction with paragraph C2(b) preceding paragraph C2(e) first mentioned. In that paragraph it is provided that, after the first mortgage indebtedness is reduced to $1,000,000 or after November 7, 1944, whichever date is earlier, interest "shall *commence to accrue* upon said bonds". In other words, the beginning of the accrual period was the earlier of the two events mentioned. Under this provision no interest could accrue until at least one of the events occurred. As a matter of fact, the first mortgage indebtedness was not reduced until after November 7, 1944. Under the plain terms of paragraph C2(b), therefore, interest did not commence to accrue on the bonds until November 7, 1944. Consequently the ac-

crued and unpaid interest mentioned in said paragraph C2(e) could only have been the interest accruing after November 7, 1944, for it was to begin to accrue only after that date.

We are further of the opinion that the "prior periods" mentioned in paragraph C2(e) are the accounting periods which elapse prior to the then current accounting period and after occurrence of the events prescribed as necessary to start the accrual of interest. In other words, it is clear that the words "prior periods" refer only to accounting periods which elapse after July 16, 1935 and not to any period prior thereto.

It is asserted also that the original plan of reorganization violates the priority rule prescribed by Case v. Los Angeles Lumber Products Company, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, in which for the first time the Supreme Court fully expounded the respective rights of various classes of creditors under the existing amendments to the Bankruptcy Act. We think that there is nothing in the original plan which violates the teachings of the Los Angeles case. Moreover, whether the decree of July 16, 1935 was erroneous is wholly immaterial here, for that decree remains in full force and effect, there having been no appeal or review of any character. Both former section 77B of the Bankruptcy Act and Clause (1) of Section 224 of Chapter X of the Bankruptcy Act, Section 624(1), Title 11 U.S.C.A. provide that upon confirmation, the plan shall be binding upon the creditors, debtor and stockholders. Such an order is res judicata not only of all questions decided but of all questions that might have been raised at the time it was entered. Prudence Realization Corp. v. Ferris, 323 U.S. 650 at page 655, 65 S.Ct. 539, 89 L.Ed. 528. Obviously, therefore, after confirmation of the plan and a final decree, they are not open to collateral attack. Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371 at page 377, 60 S.Ct. 317, 84 L.Ed. 329, even though the judgment may have been erroneous. Stoll v. Gottlieb, 305 U.S. 165 at page 172, 59 S.Ct. 134, 83 L.Ed. 104.

The bondholders complain of the refusal to admit certain evidence, including a document relating to the organization of a bondholders' committee, a letter by that committee stating that the committee would be diligent in protecting the interest of the bondholders and letters from the debtor said to be material because they did not mention that the accrued interest was to be cancelled. None of these documents discloses anything other than that there was a bondholders' committee; that it promised to be diligent, and that the past due interest was not mentioned. There is no statement in any of the letters that the matured interest coupons would not be cancelled. It is perfectly obvious, we think, that none of this evidence was of the slightest materiality. It threw not the slightest bit of light upon the question of whether the plan as confirmed included cancellation of past due interest. We have seen that the plan and the decree confirming it constitute an adjudication of all questions submitted and all that might have been submitted. We have seen likewise that the plan and decree clearly contemplated that the interest coupons should be cancelled and the obligation of the Club therefor terminated. Extrinsic evidence was not admissible in a collateral proceedings to contradict, impeach, vary or explain the judicial record. Hill v. U. S., 298 U.S. 460 at page 464, 56 S.Ct. 760, 80 L.Ed. 1283; In re Crosby Stores, Inc., 2 Cir., 65 F.2d 360 at page 361; Karnes v. Keck, D.C.E.D.Ill., 11 F.Supp. 577 at page 578. Even if we should indulge an exception to this rule in case of an ambiguity in a decree, the present contention would be of no avail, for, as we have pointed out, when all the provisions of the plan of the decree are construed together as they must be, there is no ambiguity but, on the contrary, only the obvious fact that the decree forever destroyed any liability on the part of the debtor to pay the interest maturing prior to the entry of that decree.

The judgment is affirmed.